## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NIKEA BYERS, GABRIELLE WINANS, KENNETH SMITH, TANISHA MADISON, and WANDA SINKLER, individually and on behalf of all others similarly situated, | ) ) ) ) ) ) | **CIVIL ACTION NO.: 2:26-cv-00448-GJP** |
| Plaintiffs, | ) | |
| v. | ) ) | |
| SUNRISE SENIOR LIVING, LLC, THE 401(K) PLAN FIDUCIARY COMMITTEE OF SUNRISE SENIOR LIVING, LLC, and JOHN DOES 1-10, | ) ) ) ) ) | |
| Defendants. | ) | |

## AMENDED CLASS ACTION COMPLAINT[1]

Plaintiffs Nikea Byers, Gabrielle Winans, Kenneth Smith, Tanisha Madison, and Wanda Sinkler ("Plaintiffs"), by and through their attorneys, on behalf of the Sunrise Senior Living 401(k) Plan (the "Plan"),[2] themselves and all others similarly situated, state and allege as follows:

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Sunrise Senior Living, LLC ("Sunrise" or the "Company"), and the 401(k) Plan Fiduciary Committee of Sunrise Senior Living, LLC and its members during the

---

[1] Plaintiffs file this Amended Class Action Complaint pursuant to the Court Order dated March 25, 2026. *See* ECF No. 9 ("Plaintiffs are evaluating the extent to which, if at all, the information and documents impact their allegations and claims, including whether they intend to file an Amended Complaint.").

[2] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

Class Period (the "Committee") (collectively, the Company and the Committee are referred to as "Defendants").

2.      The Plan is a defined contribution plan, established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. *See* Independent Auditors' Report ("Auditors' Report"), attached to 2024 Form 5500 for the Plan, at 7 ("The Plan is a defined contribution plan, pursuant to the provisions of Section 401(k) of the Internal Revenue Code (the "IRC"). The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended.").

3.      To safeguard plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 333 (3d Cir. 2019).

4.      The Department of Labor ("DOL") has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Sept. 2019), at 2[3]; *see also Tibble v. Edison Int'l,*

---

[3] Available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited January 13, 2026).

135 S. Ct. 1823, 1823 (2015) ("*Tibble I*") (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

5.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options. "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

6.     "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").

7.     The Supreme Court reiterated that interpreting "ERISA's duty of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of some kind to monitor investments and remove imprudent ones" and a plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones.  *Hughes v. Nw. Univ.*, 595 U.S. 170, 175, 142 S. Ct. 737, 741, 211 L. Ed. 2d 558 (2022).

8.     Plaintiffs allege that during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties it owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, failing to objectively and adequately review the Plan's investment portfolio, initially and on an ongoing basis, with due care to ensure that each investment option was prudent, in terms of performance.

9.     At all times during the Class Period, the Plan had about three hundred thousand dollars in assets under management. At the Plan's fiscal year end in 2020, the Plan had

$298,880,271 in assets under management that were/are entrusted to the care of the Plan's fiduciaries. *See* 2020 Form 5500 for the Plan, Schedule H, at 2.

10. By 2024, the Plan had $360,105,590 in assets under management. *See* 2024 Form 5500 for the Plan, Schedule H, at 2.

11. The Plan is also large in terms of the number of its participants. At the beginning of the Class Period, the Plan had 22,188 participants. *See* 2020 Form 5500 for the Plan, at 2. By 2024, the Plan had 23,402 participants. *See* 2024 Form 5500 for the Plan, at 2.

12. With regard to the Plan's investments, Defendants breached their fiduciary duty of prudence by selecting and/or maintaining a guaranteed investment contract ("GIC") in the Plan with lower crediting rates compared to available, similar investments with higher crediting rates. The crediting rate is the guaranteed rate of return for the investment fund.

13. Specifically, Defendants allowed substantial assets in the Plan to be invested in a Guaranteed Income Fund ("Prudential[4] GIF"), a benefit-investment contract. The Prudential GIF provided a significantly lower rate of return than other comparable investments that Defendants could have made available to Plan participants.

14. A prudent fiduciary would not have included this underperforming investment option that also carried significantly more risk than other investment options that had similar goals, *i.e.,* preservation of investment assets.

15. Prudential/Empower benefited significantly from Plan participants being invested in the Prudential GIF. A prudent fiduciary who adequately monitored the Plan's investments and

---

[4] "The Plan has an Evergreen Group Annuity Contract with Empower [Annuity Insurance Company] for the Guaranteed Income Fund as of December 31, 2022 and for the period April 1, 2022 through December 31, 2022 and Prudential [Retirement Insurance and Annuity Company] as of December 31, 2021 and for the period of January 1, 2022 through March 31, 2022." Auditors' Report, attached to 2022 Form 5500 for the Plan, at 12.

placed the interests of participants in the Plan above all would have recognized that the Prudential GIF was benefiting Prudential/Empower at the expense of the participants in the Plan. The investments in the Prudential GIF were held and invested by Prudential/Empower, which kept the spread (the difference between the amount it earned on the investment and the amount it paid to the Plan's participants). The crediting rates that Prudential/Empower provided to the Plan were and are so low that Prudential/Empower reaped a windfall on the spread.

16.     Plaintiffs also allege that the Defendants engaged in prohibited transactions with a party-in-interest. Specifically, Defendants breached their fiduciary duties of prudence by allowing a party-in-interest, Prudential/Empower,[5] to benefit from its provision of investment services to the Plan by receiving excessive compensation for managing the Prudential GIF.

17.     The arrangements and transactions with Prudential/Empower are prohibited transactions because they "amount[] to a 'direct or indirect ... furnishing of services ... between the plan and a party in interest,' 29 U.S.C. § 1106(a)(1)(C)." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 601 (8th Cir. 2009).

18.     Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

---

[5] "Certain of the Plan's investments are managed by affiliates of the trustees [Prudential prior to April 1, 2022 and Empower on April 1, 2022 and continuing thereafter], and therefore, these transactions qualify as party-in-interest transactions. Fees incurred by the Plan for the investment manager services are included in net depreciation in the fair value of investments, as they are paid through revenue sharing, rather than a direct payment." Auditors' Report, attached to 2022 Form 5500 for the Plan, at 13; *see also id*., at 7 ("Effective April 1, 2022, Empower acquired the full-service retirement business of Prudential.").

19.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duty of prudence (Count I), failure to monitor fiduciaries (Count II) and violations of ERISA's prohibited transaction (Counts III).

## II.     JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, et seq.

21.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

22.     For example, Sunrise has at least 11 facilities located in Pennsylvania all of which are located in the Eastern District of Pennsylvania. *See* https://www.sunriseseniorliving.com/communities/pa.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Plaintiff, Nikea Byers resides in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## III.     PARTIES

### Plaintiffs

24.     Plaintiff, Nikea Byers ("Byers"), resides in Philadelphia, Pennsylvania. During her employment, Plaintiff Byers participated in the Plan. Plaintiff Byers invested in the Prudential GIF in the Plan and suffered injury to her Plan account due to the significant underperformance of the Prudential GIF.

25.     Plaintiff, Gabrielle Winans ("Winans"), resides in Villa Rica, Georgia. During her employment, Plaintiff Winans participated in the Plan. Plaintiff Winans invested in the Prudential GIF in the Plan and suffered injury to her Plan account due to the significant underperformance of the Prudential GIF.

26.     Plaintiff, Kenneth Smith ("Smith"), resides in New Bern, North Carolina. During his employment, Plaintiff Smith participated in the Plan. Plaintiff Smith invested in the Prudential GIF in the Plan and suffered injury to his Plan account due to the significant underperformance of the Prudential GIF.

27.     Plaintiff, Tanisha Madison ("Madison"), resides in St. Louis, Missouri. During her employment, Plaintiff Madison participated in the Plan. Plaintiff Madison invested in the Prudential GIF in the Plan and suffered injury to her Plan account due to the significant underperformance of the Prudential GIF.

28.     Plaintiff, Wanda Sinkler ("Sinkler"), resides in Halethorpe, Maryland. During her employment, Plaintiff Sinkler participated in the Plan. Plaintiff Sinkler invested in the Prudential GIF in the Plan and suffered injury to her Plan account due to the significant underperformance of the Prudential GIF.

29.     Plaintiffs have standing to bring this action on behalf of the Plan because they participated and invested in the Plan and were injured by Defendants' unlawful conduct. Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duties as described herein.

30.     Plaintiffs did not have knowledge of all material facts necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

**Defendants**

**Company Defendant**

31.     Sunrise Senior Living, LLC is the Plan sponsor and a Plan administrator with a principal place of business at 7902 Westpark Drive, McLean, Virginia. *See* 2024 Form 5500 of the Plan, at 1; *see also* Sunrise Senior Living 401(k) Plan Summary Plan Description ("SPD"), at 19 ("The Plan Sponsor and Plan Administrator is Sunrise Senior Living, LLC.").

32.     The Plan is administered by the 401(k) Plan Fiduciary Committee of Sunrise Senior Living, LLC, whose members are appointed by the Company. *See* Sunrise Senior Living 401(k) Plan Investment Policy Statement ("IPS"), at 1 ("The Company has appointed the 401(k) Plan Fiduciary Committee of Sunrise Senior Living, LLC (the "Committee") to fulfill the Company's fiduciary duties in regards to Plan investments.").

33.     Sunrise appointed the Committee to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers. As will be discussed below, the Committee fell well short of these fiduciary goals. Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

34.     Accordingly, Sunrise during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it had a duty to monitor the actions of the Committee.

35.    For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Committee Defendants**

36.    As discussed above, Sunrise appointed the 401(k) Plan Fiduciary Committee of Sunrise Senior Living, LLC to, among other things, ensure that the investments available to Plan participants are appropriate, had no more expense than reasonable and performed well as compared to their peers.

37.    "[T]he Committee is responsible for the control, management and administration of all U.S. employee 401(k) Plans sponsored by the Company." Charter for the 401(k) Plan Fiduciary Committee of Sunrise Senior Living, LLC ("Committee Charter"), at 2.

38.    The Committee's responsibilities include, but are not limited to: "… c. Establishing procedures for selecting and monitoring trustees, investment managers/advisors, insurance companies or any other fiduciary with investment responsibilities ("Investment Fiduciaries"), or investment funds or other options made available under a Plan for participant investment ("Investment Funds"); d. Establishing procedures for selecting and monitoring accountants, attorneys, record keepers, consultants and other service providers other than Investment Fiduciaries ("Service Providers"); and e. Ensuring that the preceding activities are adequately documented as appropriate." Committee Charter, at 2-3.

39.    The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

40.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Committee Defendants."

## IV.     CLASS ACTION ALLEGATIONS[6]

41.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[7]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Sunrise Senior Living 401(k) Plan, at any time between January 23, 2020 through the date of judgment (the "Class Period").

42.     The members of the Class are so numerous that joinder of all members is impractical. The 2024 Form 5500 lists 23,402 Plan "participants with account balances as of the end of the plan year." 2024 Form 5500 at 2.

43.     Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged

---

[6] Although this is a proposed class action, the allegations in this complaint are alternatively pled in derivative fashion on behalf of the Plan because class certification is not necessarily required for Plaintiffs to prosecute claims on behalf of the Plan and all participants. *See, e.g.*, *In re: Wilmington Trust Corp.,* 2013 WL 4757843, at *3 (D. Del. Sept. 4, 2013) (granting plaintiffs' motion to proceed derivatively on behalf of all plan participants without class certification, because of the nature of such claims). ERISA Section 502(a), 29 U.S.C. § 1132(a), authorizes pension plan participants to bring suit on behalf of a plan to recover losses to a plan.

[7] Plaintiffs reserve the right to modify the class definition and/or propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

44. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A. Whether Defendants are/were fiduciaries of the Plan;

B. Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;

C. Whether the Company failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;

D. The proper form of equitable and injunctive relief; and

E. The proper measure of monetary relief.

45. Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

46. This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to

individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

47.    In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLAN

48.    The Plan is a defined contribution plan covering substantially all eligible employees of Sunrise. *See* SPD, at 2. ("You are an 'Eligible Employee' if you are employed by Sunrise Senior Living, LLC or any affiliate who has adopted the Plan. … You will become eligible to make Elective Deferral Contributions on the first day of the calendar month, coincident with or next following the date you attain age 18, provided that you are an Eligible Employee on that date.").

49.    "The Plan is intended to provide participating employees the ability to create long-term accumulation of savings through contributions to individual participant accounts and the earnings thereon." IPS, at 1.

50.    Included in the Plan's available funds was the Guaranteed Income Fund offered by Empower Annuity Insurance Company (formerly known as Prudential Retirement Insurance and Annuity Company) (EAIC). "The trustee maintains the contributions in a general account." Auditors' Report, attached to 2024 Form 5500, at 12.

51.    At the end of 2020, $67,071,232 in Plan assets were invested in the Prudential GIF. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2020 Form 5500 for the Plan, at 13.

52.    At the end of 2024, over $79 million in Plan assets were invested in the Prudential GIF. *See* Schedule H, Line 4i – Schedule of Assets (Held at End of Year), attached to 2024 Form 5500 for the Plan, at 16.

53.    The chart below demonstrates the amount of Plan assets invested in the Prudential GIF during the Class Period.

| Plan Year | Plan Assets in Prudential GIF | Total Amount of Plan Assets | Plan Assets in Prudential GIF as Percentage of Total Plan Assets |
|---|---|---|---|
| 2020 | $67,071,232 | $298,880,271 | 22.44% |
| 2021 | $70,810,204 | $330,555,409 | 21.42% |
| 2022 | $67,481,217 | $289,572,523 | 23.30% |
| 2023 | $73,481,276 | $333,311,609 | 22.05% |
| 2024 | $79,565,166 | $360,105,590 | 22.09% |

***Contributions***

54.    Eligible employees may elect to make contributions to their Plan accounts. *See* SPD, at 4 ("You may elect to reduce your Compensation (defined below) and make a contribution to the Plan on a pre-tax basis. These pre-tax contributions are known as Elective Deferral Contributions. You may elect to defer up to 100% of your Plan Compensation on a pre-tax basis but must defer at least 0% of Plan Compensation.").

55.    There is an automatic contribution feature in the Plan. *See* SPD, at 4 ("After receiving a notice from the Plan Administrator, you will be deemed to have made an Elective Deferral Contribution election in the amount of 2% of your Plan Compensation.").

56.    Sunrise may make matching contributions to participants' accounts. *See* SPD, at 4-5 ("The Employer may, in its sole discretion, make a matching contribution on your behalf if you make a 'Matched Employee Contribution'. A 'Matched Employee Contribution' is any Elective

Deferral Contribution or Catch-up Contribution that you may make during the Plan Year. If you make a 'Matched Employee Contribution' and you are employed by the Employer on the last day of the Applicable Period the Employer may contribute to your Employer Matching Contribution Account in an amount and allocation formula as determined by the Employer in its sole discretion.").

57.    Like other companies that sponsor 401(k) plans for their employees, Sunrise enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

58.    Sunrise also benefits in other ways from the Plan's matching program. It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

59.    Given the size of the Plan, Sunrise likely enjoyed significant tax and cost savings from offering a match.

## VI.    THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT DEFENDANTS FAILED TO SELECT AND MONITOR THE PRUDENTIAL GIF IN A PRUDENT MANNER

### A.    The Stable Value Fund in the Plan

60.    As indicated above, the Plan was invested in the Prudential GIF, as proprietary stable value fund managed by Prudential.

14

61.     A stable value fund is a conservative, fixed income investment vehicle that provides a relatively stable rate of return.[8]

62.     Stable value funds can be managed via guaranteed insurance contracts ("GICs"), "in which the fund manager holds or invests in a single group annuity contract issued directly to the retirement plan and the plan sponsor receives a direct guarantee of principal and accrued interest from the issuer."[9]

63.     The Prudential GIF is thus a contract and not a mutual fund investment. To be sure, there are important differences between a mutual fund and stable value fund. Unlike mutual funds, stable value funds are defined by their predictability, they offer a set return on investment irrespective of management style, and their associated risk level is a creature of their structural design rather than their investment strategy.

64.     There are generally three types of GICs: a traditional GIC (sometimes called an insurance company general account), like the Prudential GIF; a separate account GIC; and a synthetic GIC (sometimes called a security backed investment contract).

65.     The Auditors' Report attached to the 2024 Form 5500 for the Plan states as follows:

> The Plan has an Evergreen Group Annuity Contract with [Prudential/]Empower for the Guaranteed Income Fund. The trustee *maintains the contributions in a general account*. The account has interest credited daily based on interest crediting rates declared by the trustee in advance of the contract's specific guarantee period. ***The trustee guarantees the crediting rate and principal for the guarantee period***. The contract is included in the financial statements at contract value as reported to the Plan by the trustee. ***Contract value represents deposits made to the contract, plus earnings at guaranteed crediting rates, less participant withdrawals and fees. Participants may ordinarily direct the withdrawal or transfer of all or a portion of their investment at the contract value***.

---

[8] ERISA Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions, https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

[9] *Id.*

> Certain events may limit the ability of the Plan to transact at contract value with the issuer. Such events include the following: (1) material plan amendments (including partial or complete termination of the Plan or merger of the Plan with another plan); (2) the failure of the Plan's trust to qualify for exemption from federal income taxes or any required prohibited exemption under ERISA; (3) changes in the Plan's prohibition on competing investment options; and (4) premature termination of the contract by the Plan. ***The Plan Sponsor does not believe that the occurrence of any such event, which would limit the Plan's ability to transact at contract value with participants, is probable***.
>
> In addition, certain events allow the issuer to terminate the contract with the Plan and settle at an amount different from contract value. These events may be different under each contract. Such events include (1) an uncured violation of the Plan's investment guidelines, (2) a breach of material obligation under the contract, (3) a material misrepresentation, or (4) a material amendment to the agreement without the consent of the issuer.
>
> There are no reserves against contract value for credit risk of the contract issuer or otherwise. The crediting interest rate is based on a formula agreed upon with the issuer, with a minimum rate of 1.5 percent. ***Such interest rates are reviewed on a semi-annual basis for resetting***.

Auditors' Report attached to the 2024 Form 5500 for the Plan, at 13 (emphasis added).

66. Benefit responsive means that the participants can initiate transactions, such as withdrawals, at book value without adjustment.

67. For the above reasons, the Prudential GIF's crediting rates can be compared to other traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive; (2) whose contracts are with creditworthy insurance carriers; and (3) whose insurance company cannot terminate the agreement prior to the scheduled maturity date. The Prudential GIF's crediting rates can also be compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the Prudential GIF, therein making stated risk considerations equivalent.

16

**B.      Defendants Failed ERISA's High Standards Regarding Process and Methodology of Evaluating Investments**

68.      As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

69.      ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828; *see also Hughes*, 142 S. Ct. at 741.

70.      As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries. Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services. …" DOL 408(b)(2) Regulation Fact Sheet.

71.      The duty "…to act solely in the best interest of participants has been a key tenet of ERISA since its passage." "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.

72.      Acting in the sole interest of plan participants is all encompassing. A fiduciary must monitor all investment options in a 401(k) plan as a prudent investment professional. *See* the U.S. Department of Labor, Employee Benefits Security Administration (EBSA)'s "Meeting Your Fiduciary Responsibilities," at 2 ("The duty to act prudently is one of a fiduciary's central responsibilities under ERISA. It requires expertise in a variety of areas, such as investments."),

available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf.

73.    Reasonable prudent monitoring of stable value funds like GICs requires fiduciaries to evaluate the terms and conditions of the GIC contracts, research the relevant market, and test the market, by, among other things, issuing requests for information and proposals from competing GIC providers.

74.    In the case of stable value options, there is not one commonly accepted and publicly available index in which to compare GICs.

75.    Accordingly, the measurement of stable value funds, and specifically the Prudential GIF, against prudently managed alternative stable value funds is critical given that these alternatives represent other investments available to a plan, which may increase the likelihood that participants reach/live their preferred lifestyle in retirement.

76.    Indeed, "peer comparison is one of the most widely used and accepted methods of equity analysis used by professional analysts, individual investors, and professionals."[10]

77.    Whether a plan fiduciary enlists the assistance of an investment manager, consultant, or advisor, the plan's fiduciaries are not relieved of fiduciary liability for selecting and monitoring the plan's investment options.

78.    It is black letter law that a fiduciary's duty to conduct an "independent investigation into the merits of a particular investment," is the "most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litigation*, 74 F.3d 420, 435 (3d Circ. 1996). *Hughes*, 142 S. Ct. at 738 (noting ERISA fiduciaries are required to "conduct their own independent evaluation to determine which investments may by prudently included in the plan's menu of options.").

---

[10] *See* https://www.investopedia.com/terms/p/peer-group.asp (last visited Mar. 30, 2026).

79. It may also indicate a lack of adequate care and attention to ignore sound advice provided by investment advisors.

80. To the extent plan fiduciaries have adopted an investment policy statement, those fiduciaries "must comply with the plan's written statements of investment policy, insofar as those written statements are consistent with the provisions of ERISA." *Lauderdale v. NFP Retirement, Inc.*, 2022 WL 17260510, at *10 (S.D. Cal. Nov. 17, 2022). That is, the investment policy statement must be written with the sole interest of the plan participant in mind.

81. Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing the Plan's investments and fees because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.").

82. Prior to filing the initial Complaint, in an attempt to discover the details of the Plan's mismanagement, Plaintiffs first wrote to the Plan administrator on August 21, 2025 to request, among other things, "all written instruments" governing or pertaining to the Plan, including "Investment Policy Statements, and amendments, exhibits, or appendices thereto[,]" "Investment Management Contracts, or other instruments under which the Plan was established or operated, and all amendments, exhibits, or appendices thereto," and as well as any committee's meeting minutes. This request was made pursuant to Section 104(b)(4) of ERISA.

83.    By letter dated August 29, 2025, the Plan's administrator responded to Plaintiffs' request. No meeting minutes, to the extent they exist, were produced in response to Plaintiffs' request. Nor was the investment management contract for the Prudential GIF provided.

84.    Subsequent to the filing of the initial Complaint, Defendants voluntarily provided a limited set of heavily redacted meeting minutes and excerpts of investment reviews.

85.    Reviewing meeting minutes, when they exist, is the bare minimum needed to peek into a fiduciary's monitoring process. But in most cases, like here, even that is not sufficient. For, "[w]hile the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not … suffice in every case to demonstrate prudence. Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Sacerdote v. New York Univ.*, 9 F.4th 95, 111 (2d Cir. 2021) (emphasis in original).

86.    Here, it is obvious Defendants neither faithfully followed the Plan's IPS nor engaged in the appropriate methods to investigate and determine the merits of the Prudential GIF.

87.    For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes and methods based upon several factors as described below.

88.    Per the Plan's IPS, one of the Committee's "most important responsibilities" was the selection of investment offerings in the Plan. *See* IPS, at 3 ("The selection of investment options offered under the Plan is among the Committee's most important responsibilities."). The Committee is/was responsible for determining the appropriateness of the Plan's investment offerings and monitoring investment performance. *See id.*, at 3-7.

89.     When selecting the Plan's investment offerings, maximizing return was/is part of the criteria the Committee was to consider. *See id.*, at 2 ("The Committee will select the Plan's investment options based on criteria deemed relevant, from time to time, by the Committee, These criteria may include, but are not limited to, the following: … ***Maximization of return within reasonable and prudent levels of risk***.") (emphasis added).

90.     Continuous monitoring of the Plan's investment offerings was/is required by the Committee pursuant to the IPS. *See id.*, at 5 ("The ongoing monitoring of investments is a regular and disciplined process intended to ensure that a previously selected investment option continues to satisfy the selection process and that an investment option continues to be a prudent option offered for investment in the Plan. The process of monitoring investment performance relative to specified guidelines will be consistently applied.").

91.     Comparing the performance of investment offerings to the performance of comparator funds was/is a factor to consider by the Committee when monitoring the investments. *See id.* ("The following are some, but not all, general factors that may be considered in ongoing monitoring: … Performance of investment alternatives.").

92.     Further, the IPS determines that principal preservation offerings, like the Prudential GIF, "should be reviewed with a primary focus on the investment's ability to preserve capital and minimize risk. Criteria reviewed should include, but not be limited to, ***credit quality, diversification, and stability of insurance provider***, if applicable." *Id.*, at 6.

93.     As will be discussed in more detail below, the Committee fell well short of these fiduciary expectations.

94.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in, *inter alia*, the selection (and maintenance) of the Prudential GIF in the Plan

21

throughout the Class Period that wasted the assets of the Plan and the assets of participants because of unnecessary costs and underperformance.

## C. Defendants Failed to Consider the Undue Riskiness of the Prudential GIF

95. "When evaluating a traditional GIC, the most important consideration for the fiduciary- along with the contract terms- is the insurer's financial strength rating since an insurer's general account backs the guarantee that is at the core of this product."[11] The Plan's IPS recognizes the "stability of [an] insurance provider" is an important criteria. *Id.*, at 6.

### 1. Prudential/Empower Pose A Severe Risk Of Becoming Insolvent

#### a. The Securities and Exchange Commission Has Warned that Ratings from Credit Rating Agencies Are Unreliable

96. Because a guaranteed insurance account product – like the Prudential GIF - is backed by the full faith and credit of the insurer, a focus must be placed on the creditworthiness of the insurer. It used to be the belief that an insurer's financial strength could be determined in part from its ratings from the four major rating agencies. This is no longer the case.

97. A June 7, 2023 Securities and Exchange statement declared that ratings issued by ratings agencies are not reliable. It said these agencies shared blame for the 2008 financial crises:

> These entities' ratings were key to the marketing and sales of mortgage-backed securities, relied on by investors to make informed investment decisions — flaws and conflicts of interest notwithstanding. In some instances, Federal regulations required the use of credit ratings. As the 2011 report noted, the markets' — and, at times the federal government's — reliance on credit ratings that turned out to be highly misleading had consequences that reverberated "throughout the financial system." And not in a good way. …The Commission is replacing the references to credit ratings in Rules 101 and 102 of Regulation M with an alternative standard of creditworthiness that relies on credit risk models.

---

[11] https://www.dol.gov/agencies/ebsa/about-ebsa/about-us/erisa-advisory-council/2009-stable-value-funds-and-retirement-security-in-the-current-economic-conditions.

22

https://www.sec.gov/newsroom/speeches-statements/lizarraga-statement-credit-ratings-060723.

98.     The SEC's reference to reliable credit risk models is instructive. It is widely recognized that the two greatest risks faced by for-profit life insurance and annuity ("L&A") carriers are: (1) Higher Risk, Offshore Reinsurance and (2) Higher-Risk, Less-Liquid and Investment Concentrations.  *See generally*, September 13, 2022 Letter Submitted by Thomas D. Gober, Insurance and Reinsurance Fraud Expert, to The Hon. Sherrod C. Brown, Chairman Committee on Banking, Housing, and Urban Affairs, at p. 57-68 (available at https://www.congress.gov/117/chrg/CHRG-117shrg53607/CHRG-117shrg53607.pdf).[12]

99.     These two higher-risk categories should always be compared against the L&A carrier's surplus, not total assets.  This credit risk model enables the reader (or Plan fiduciary) to better assess the degree to which those higher risks can be a real threat to the long-term viability of the L&A carrier.

###### b.     Based on its Insufficient Surplus, Prudential/Empower Was/Is at Severe Risk of Insolvency

100.     Available surplus is the most relevant criteria for measuring insurance company credit worthiness for a number of reasons, the most pertinent of which is that surplus is the only buffer between a viable insurer and an insolvent one. In other words, if an asset must be written down, the total write-down comes out of surplus. That is why it is imprudent to have a thin surplus buffer relative to the carrier's risk profile.

101.     An important surplus adequacy benchmark ratio is the Surplus to Liabilities (S/L) Ratio. The higher the ratio, the better.  The national average for the L&A industry is roughly 7.5%.

---

[12] The letter to The Hon.  Sherrod C. Brown is found within "Current Issues in Insurance" Hearing Before the Committee on Banking, Housing, and Urban Affairs United States Senate, September 8, 2022, available at https://www.govinfo.gov/.

That average of 7.5% is significantly pulled down by some of the larger, aggressive private equity-controlled carriers with much lower ratios. During the Class Period, Empower (and before it, Prudential), had an alarmingly low S/L ratio.  For example, as of 2024, Empower's S/L ratio was less than 1%:

ANNUAL STATEMENT FOR THE YEAR 2024 OF THE Empower Annuity Insurance Company

**LIABILITIES, SURPLUS AND OTHER FUNDS**

|  |  | 1 Current Year | 2 Prior Year |
|---|---|---|---|
| 28. | Total liabilities (Lines 26 and 27) | 106,414,669,390 | 91,068,627,605 |
| 29. | Common capital stock | 2,500,000 | 2,500,000 |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | 0 | 0 |
| 32. | Surplus notes | 0 | |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | 943,498,537 | 943,498,537 |
| 34. | Aggregate write-ins for special surplus funds | 42,704,077 | 15,222,689 |
| 35. | Unassigned funds (surplus) | 29,697,164 | (24,056,237) |
| 36. | Less treasury stock, at cost: | | |
| 36.1 | _____ shares common (value included in Line 29 $ _____ ) | | |
| 36.2 | _____ shares preferred (value included in Line 30 $ _____ ) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $ _____ in Separate Accounts Statement) | 1,015,899,778 | 934,664,989 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 1,018,399,778 | 937,164,989 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 107,433,069,168 | 92,005,792,594 |

Total Surplus: $    1,018,399,778  EAIC's 2024 Surplus to Liabilities

Total Liabilities: $  106,414,669,390  Ratio is Less Than 1%. The

**Surplus to Liabs Ratio:**        **0.96%**        National Average is About **7.5%**.

102.    There are numerous L&A carriers that have substantially higher S/L ratios than Empower.  For example, New York Life, at December 31, 2024, had (see below) $26.43 billion in surplus and $218.5 billion in liabilities. That yields a S/L ratio of 12.1%:

| 28. | Total liabilities (Lines 26 and 27) | 218,473,153,964 | 206,607,540,338 |
|---|---|---|---|
| 29. | Common capital stock | | |
| 30. | Preferred capital stock | | |
| 31. | Aggregate write-ins for other-than-special surplus funds | | |
| 32. | Surplus notes | 4,233,167,821 | 4,232,366,504 |
| 33. | Gross paid in and contributed surplus (Page 3, Line 33, Col. 2 plus Page 4, Line 51.1, Col. 1) | | |
| 34. | Aggregate write-ins for special surplus funds | 803,673,430 | 434,820,194 |
| 35. | Unassigned funds (surplus) | 21,390,599,996 | 20,626,889,733 |
| 36. | Less treasury stock, at cost: | | |
| 36.1 | _____ shares common (value included in Line 29 $ _____ ) | | |
| 36.2 | _____ shares preferred (value included in Line 30 $ _____ ) | | |
| 37. | Surplus (Total Lines 31+32+33+34+35-36) (including $ _____ in Separate Accounts Statement) | 26,427,441,247 | 25,294,076,431 |
| 38. | Totals of Lines 29, 30 and 37 (Page 4, Line 55) | 26,427,441,247 | 25,294,076,431 |
| 39. | Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) | 244,900,595,211 | 231,901,616,769 |

Total Surplus: $    26,427,441,247  EAIC's 2024 Surplus to Liabilities

Total Liabilities: $  218,473,153,964  Ratio is Less Than 1%. The

**Surplus to Liabs Ratio:**        **12.10%**        National Average is About **7.5%**.

**c.**     **Prudential/Empower Is/Was Rendered Vulnerable Because of its Higher Risk, Offshore Reinsurance Compared to its Surplus**

103.    Specific to this matter, Empower entered into several significant reinsurance transactions with one offshore reinsurer. First, Empower ceded (Schedule S – Part 3 shown below) $2.64 billion in Reserve Credit (column 9) to Hannover Life Reassurance Company of America (Bermuda) Ltd (HLRCA Bermuda). The "reserve credit" means that Empower has deducted that $2.64 billion from its liabilities because the reinsurer has reportedly set up that amount in liabilities on their end. As an offshore reinsurer, HLRCA Bermuda does not report to US regulators under US SAP (Statutory Accounting Principles). This lack of transparency is significant and makes it difficult, most often impossible, to determine how the reinsurer is accounting for the transaction on their end.

ANNUAL STATEMENT FOR THE YEAR 2024 OF THE Empower Annuity In

## SCHEDULE S - PART 3 - SECTION

Reinsurance Ceded Life Insurance, Annuities, Deposit Funds and Other Liabilities Without Life or Disability Contingencies, and Related Ber

| 1 NAIC Company Code | 2 ID Number | 3 Effective Date | 4 Name of Company | 5 Domiciliary Jurisdiction | 6 Type of Reinsurance Ceded | 7 Type of Business Ceded | 8 Amount in Force at End of Year | 9 Reserve Cr Current Year |
|---|---|---|---|---|---|---|---|---|
| 0399999. Total General Account - Authorized U.S. Affiliates | | | | | | | 0 | 0 |
| 0699999. Total General Account - Authorized Non-U.S. Affiliates | | | | | | | 0 | 0 |
| 0799999. Total General Account - Authorized Affiliates | | | | | | | 0 | 0 |
| ...65676 | ...35-0472300 | 01/01/1998 | Lincoln National Life Insurance Company | IN | CO/I | VA | 0 | 0 |
| ...66869 | ...31-4156830 | 12/31/2023 | Nationwide Insurance | OH | CO/G | FA | 0 | 161,418 |
| 0899999. General Account - Authorized U.S. Non-Affiliates | | | | | | | 0 | 161,418 |
| 1099999. Total General Account - Authorized Non-Affiliates | | | | | | | 0 | 161,418 |
| 1199999. Total General Account Authorized | | | | | | | 0 | 161,418 |
| 1499999. Total General Account - Unauthorized U.S. Affiliates | | | | | | | 0 | 0 |
| 1799999. Total General Account - Unauthorized Non-U.S. Affiliates | | | | | | | 0 | 0 |
| 1899999. Total General Account - Unauthorized Affiliates | | | | | | | 0 | 0 |
| 2199999. Total General Account - Unauthorized Non-Affiliates | | | | | | | 0 | 0 |
| 2299999. Total General Account Unauthorized | | | | | | | 0 | 0 |
| 2599999. Total General Account - Certified U.S. Affiliates | | | | | | | 0 | 0 |
| 2899999. Total General Account - Certified Non-U.S. Affiliates | | | | | | | 0 | 0 |
| 2999999. Total General Account - Certified Affiliates | | | | | | | 0 | 0 |
| ...00000 | ...AA-3191255 | 12/31/2022 | Hannover Life Reassur Co. of Amer (Bermuda) LTD | BMU | CO/FW/G | FA | 0 | 2,638,835,092 |

104.    Separate and in addition to the reserve credit reported above, Empower has also entered into a Modified Coinsurance (ModCo) reinsurance contract with HLRCA Bermuda. Note below, in column 14, that ModCo reinsurance balance was **$25.4 billion**:



105.    The total reported balance of **both offshore contracts is $28 billion**. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:

106.    The end result of the above maneuvering is that Empower made it appear it had many billions less liabilities than it really had by purportedly off-loading its liabilities to a reinsurer.  There is no way to confirm the reinsurer's viability because the reinsurer is off-shore and does not report under statutory accounting in the United States.[13]

---

[13] *See* "Moody's Waves Yellow Flag as Worries Mount About Reinsurance Deals," by Warren S. Hersch, June 5, 2203 (quoting Moody's Investors Service as stating off-shore reinsurer "business provides less transparency for investors and is generally subject to less regulation than business that resides onshore in U.S.-regulated entity" *See also* "FSOC raises alarm on insurers' use of

107.    Moreover, because HLRCA Bermuda does not report in the US in compliance with US statutes, under US SAP, it can't be determined what the "substance" of the transactions are and if HLRCA Bermuda has properly reserved for them. In fact, most technical industry media and numerous federal agencies have warned that the concern with offshore reinsurance, in addition to the lack of transparency, is that a primary motive for going offshore is "regulatory arbitrage,"[14] meaning that the regulatory regime offshore allows less stringent reserving for liabilities, lower capital requirements and less asset quality restrictions. *See* n. 17.

> **d.    Prudential/Empower Is/Was rendered Vulnerable Because of its Higher Risk, Less-Liquid Investment Concentrations**

108.    Empower has a variety of higher-risk assets in significant concentrations relative to its surplus. At December 31, 2024, Empower reported a total of $4.3 billion in higher-risk, less traditional investments that are *not* reported under Long-Term Bonds. These include $3.75 billion in commercial mortgage loans and $552 million in "Other" invested assets and Derivatives, of which $236.5 million are notably affiliated. Under the Long-Term Bonds category, Empower reports another $3.8 billion in higher-risk, less liquid bond categories, including Residential Mortgage-Backed Securities (MBS), Commercial MBS, "Other Loan-Backed and Structured Securities."

---

offshore reinsurance," by Kenneth Araullo, May 10, 2025 (stating "The US Financial Stability Oversight Council (FSOC) has raised concerns about the financial stability of life insurers, citing increasingly complex investment strategies and a growing reliance on offshore reinsurers with less stringent capital requirements."), available at https://www.insurance businessmag.com/reinsurance/news/breaking-news/fsoc-raises-alam-on-insuers-use-of-offshore-reinsurance-527931.aspx.

[14] "Regulatory arbitrage is a practice whereby firms capitalize on loopholes in regulatory systems in order to circumvent unfavorable regulations. Arbitrage opportunities may be accomplished by a variety of tactics, including restructuring transactions, financial engineering and geographic relocation to amenable jurisdictions." Investopedia, found at https://www.investopedia.com/terms/r/regulatory-arbitrage.asp.

109.   The combined total of the above-described investments is $8.1 billion. For perspective, Empower reports total surplus at the same date of **$1.02 billion**:



110.   Again, the inadequate surplus compared to the investment concentrations puts Empower in dire risk of insolvency, especially in light of the widely reported investment liquidity and valuation stresses today.

*       *       *

111.   In short, Empower/Prudential's lack of adequate surplus compared to its true liabilities during the Class Period has put Empower/Prudential squarely at risk of insolvency thereby making any "guaranteed" investment contract not worth the paper it is written on.

112.   Moreover, because HLRCA Bermuda does not report in the US in compliance with US statutes, under US SAP, it can't be determined what the "substance" of the transactions are and if HLRCA Bermuda has properly reserved for them. In fact, most technical industry media and numerous federal agencies have warned that the concern with offshore reinsurance, in addition

to the lack of transparency, is that a primary motive for going offshore is "regulatory arbitrage,"[15] meaning that the regulatory regime offshore allows less stringent reserving for liabilities, lower capital requirements and less asset quality restrictions. *See* n. 17.

> **D.    The Prudential GIF Materially Underperformed Relative to Comparator Stable Value Fund GICs**

113.    The Prudential GIF is imprudent for other reasons. Selecting and monitoring stable value products requires researching the relevant market, and testing the market by, among other things, issuing requests for proposals to solicit bid proposals. That is because stable value products are substantially similar in that their stated goal is to preserve income.

114.    Accordingly, it is a best practice for plans with substantial participant investments in stable value products to solicit competitive bids to initially select a stable value product, monitor opportunities in the entire marketplace – not just pricing from a discrete group of stable value managers like recordkeepers - on an ongoing basis, and periodically solicit competitive bids.

115.    The Plan's fiduciaries took no such steps. Had Defendants continually monitored and evaluated the Prudential GIF's rates compared to market rates, they would have known, if they did not actually know, that the investment underperformed year after year for the entire Class Period compared to other comparable stable value funds.

---

[15] "Regulatory arbitrage is a practice whereby firms capitalize on loopholes in regulatory systems in order to circumvent unfavorable regulations. Arbitrage opportunities may be accomplished by a variety of tactics, including restructuring transactions, financial engineering and geographic relocation to amenable jurisdictions." Investopedia, found at https://www.investopedia.com/terms/r/regulatory-arbitrage.asp

116.    If Defendants had adopted and implemented a prudent process or policy, they could easily have selected or switched to another stable value fund with a proven track record of competitive returns at the very least prior to 2024.[16]

117.    The terms of the Prudential GIF allow for this action. The Prudential GIF provides a guaranteed interest rate that is announced in advance and is guaranteed for a six-month period.[17] So at a minimum, every six months during the Class Period, Defendants had an opportunity to rectify their imprudent conduct and select another GIC with higher crediting rates. Moreover, the terms of the Prudential GIF contract allowed Plan participants to withdraw their investments at full value[18] to invest elsewhere, like a prudent GIC alternative, if that choice had been made available to them by the Plan's fiduciaries. Here, the Prudential GIF was the only stable value fund offered by the Plan.

118.    As stated above, the Prudential GIF's crediting rates can be compared to other traditional GICs, commingled trust funds also called collective investment trusts, fixed annuity contracts, and other stable value funds or GICs whose terms are: (1) fully benefit-responsive, (2) whose contracts are with creditworthy insurance carriers, and (3) whose insurance company cannot terminate the agreement prior to the scheduled maturity date. Additionally, the Prudential GIF's

---

[16] Upon information and belief, in December 2024, the Plan selected another stable value fund. To the extent this is confirmed through discovery, this action was too little too late as damages to the Plan participants was already baked in by 2024.  Moreover, replacement of the Prudential GIF is meaningless if replaced by another poorly performing stable value fund compared to the comparator stable value funds alleged herein.

[17] *See* Auditor's Reports, attached to 2024 Form 5500 for the Plan, at 13 ("The crediting interest rate is based on a formula agreed upon with the issuer, with a minimum rate of 1.5 percent. Such interest rates are reviewed on a semi-annual basis for resetting.").

[18] *See* Auditor's Reports, attached to 2024 Form 5500 for the Plan, at 13 ("Participants may ordinarily direct the withdrawal or transfer of all or a portion of their investment at the contract value.").

crediting rates can be also compared to GICs in plans whose managers do not believe that there are any events that are likely to limit the ability of the plan to transact at the contract value like the Prudential GIF, therein making risk considerations equivalent.

119.    The Comparator Funds below meet these requirements. Importantly, the Prudential GIF had chronically underperforming crediting rates when compared against stable value GICs provided by other comparable carriers for other retirement plans.

120.    Defendants' selection of the imprudent Prudential GIF was clearly a result of their lack of an investment review process, or at the very minimum, failure to implement a prudent investment review process.

**1.    There are Many GICs in the Marketplace with Competitive Crediting Rates**

121.    The marketplace for GICs is robust with many insurance companies offering GICs with competitive rates.

122.    Throughout the Class Period, identical or substantially identical stable value funds with higher crediting rates, and hence lower spreads, were available to the Plan, but were not selected by Defendants.

123.    As representative examples, these comparisons include:

- Auto-Owners Life Insurance Company ("AOLIC") provided a "fully benefit-responsive investment contract" for the Auto-Owners Insurance Company Retirement Savings Plan. Auditor's Report, attached to 2023 Form 5500 for the Auto-Owners Insurance Company Retirement Savings Plan, at 9. Further, like the Prudential GIF, "[t]he plan administrator does not believe that the occurrence of and such value event, which would limit the Plan's ability to transact at contract value with participants, is probable." *Id.*, at 10. Finally, "[t]he guaranteed investment contract does not permit the insurance company to terminate the agreement prior to the scheduled maturity date." *Id.*

- The Ameritas 401(k) Retirement Plan offered a "fully benefit-responsive" unallocated insurance contract with Ameritas Life Insurance Corp. Auditor's Report attached to the 2024 Form 5500 for the Ameritas 401(k) Retirement Plan,

at 10. "Interest rate guarantees of the unallocated insurance contract are backed by assets held by the Company." *Id*. Like the Prudential GIF, "[u]nder no event may the Company terminate this contract and settle at an amount different from contract value." *Id*.

- The Standard 401(k) Plan offered "a fully benefit-responsive investment contract ("FBRIC") with Standard [Insurance Company]." Auditor's Report attached to 2024 Form 5500 for The Standard 401(k) Plan. "The Plan's ability to receive amounts due is dependent on the issuer's ability to meet its financial obligations." *Id*. Like the Prudential GIF, "The FBRIC does not permit the insurance company to terminate the agreements prior to the scheduled maturity date" and "[n]o events are probable of occurring that might limit the Plan's ability to transact at contract value with the contract issuer and that also would limit the ability of the Plan to transact at contract value with the participants." *Id*.

- The Ford Foundation Retirement Plan offered "a guaranteed fixed annuity contract" that was "fully and unconditionally guaranteed by TIAA." Auditor's Report, attached to 2024 Form 5500 for the Ford Foundation Retirement Plan, at 11. "The participant's principal, plus a specified minimum rate of interest, are guaranteed by TIAA's claims-paying ability." *Id*., at 12.

- The Transamerica 401(k) Retirement Savings Plan offered "a fully benefit-responsive GIC with TFLIC, where TFLIC maintains the contributions in a general account." Auditor's Report, attached to 2024 Form 5500 for the Transamerica 401(k) Retirement Savings Plan, at 8. "The GIC issuer contractually must repay the principal and a specified interest rate that the issuer guarantees to the Plan." *Id*. Like the Prudential GIF, "[t]he Company does not believe that the occurrence of any such events that would limit the Plan's ability to transact at contract value with participants is probable." *Id*., at 9.

124. Collectively, the GICs in the Auto-Owners Insurance Company Retirement Savings Plan, the Ameritas 401(k) Retirement Plan, The Standard 401(k) Plan, the Ford Foundation Retirement Plan, and the Transamerica 401(k) Retirement Savings Plan are referred to as the "Comparator Funds."

125. The Prudential GIF in the Plan is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when compared against GICs with similar or lower riskiness provided by other comparable carriers for other retirement plans.

32

126.    The Prudential GIF's consistent underperformance was detrimental to Plan participants. Because of the compounding losses or gains of investments, prudent fiduciaries will compare relative performance of comparable investments, rather than just absolute performance. This is because even a "1%" difference causes exponential losses beyond what occurs "each year" because of the "lost investment opportunity" that a better performing fund "would have earned over time." *Tibble II*, 843 F.3d at 1198.

127.    The Prudential GIF in the Plan had chronically underperforming crediting rates when compared against stable value GICs provided by other comparable carriers for other retirement plans.

128.    Because of the compounding losses or gains of investments, prudent fiduciaries will compare relative performance of comparable investments, rather than just absolute performance. This is because even a "1%" difference causes exponential losses beyond what occurs "each year" because of the "lost investment opportunity" that a better performing fund "would have earned over time." *Tibble II*, 843 F.3d at 1198.

### a.    The Prudential GIF performed poorly when compared to the Comparator Funds at the Start of the Class Period

129.    In 2020, the Comparator Funds performed much better than the Prudential GIF. Specifically, the Comparator Funds had an average calculated crediting rate of 3.42%. The crediting rate for the Prudential GIF in the Plan was 1.73% in 2020.

130.    The table below demonstrates the underperformance of the Prudential GIF compared to the Comparator Funds.

33

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate[19] |
|------|-----------|---------------------|-------------|-------------------|--------------------|
| 2020 | Auto-Owners Insurance Company Retirement Savings Plan | 7,192 | $620,678,961 | Auto-Owners Insurance Company | 3.07% |
| | Ameritas 401(k) Retirement Plan | 3,553 | $708,127,755 | Ameritas Life Insurance | 3.48% |
| | The Standard 401(k) Plan | 4,554 | $920,504,787 | Standard Insurance | 3.23% |
| | Ford Foundation Retirement Plan | 228 | $292,861,235 | TIAA-CREF | 4.04% |
| | Transamerica 401(k) Retirement Savings Plan | 14,722 | $2,347,162,318 | Transamerica Financial Life | 3.27% |
| | **Sunrise 401(k) Plan** | **22,188** | **$298,880,271** | **Prudential** | **1.73%** |

131.    In 2020, the Prudential GIF underperformed the Comparator Funds by 49.39%.

132.    Additionally, the Prudential GIF underperformed other GICs with similar characteristics as the Prudential GIF in 2020, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|------|-----------|---------------------|-------------|-------------------|----------------|
| 2020 | Baylor College of Medicine Retirement Plan | 12,905 | $1,493,377,139 | Lincoln Financial Group | 4.16% |
| | Alina 401(k) Retirement Savings Plan | 32,203 | $2,690,046,457 | Brighthouse Life Insurance Company | 3.72% |

---

[19] For crediting rates not identified in the plans' Form 5500s, the calculated yield is interest credited divided by the end of year balance.

| | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| | HCC Insurance Holdings Inc. 401(k) Plan | 2,711 | $428,308,461 | Massachusetts Mutual Life Insurance Company | 3.56% |
| | American United Life Progress Sharing Plan and Trust | 2,699 | $435,970,029 | American United Life Insurance Company | 3.54% |
| | **Sunrise 401(k) Plan** | **22,188** | **$298,880,271** | **Prudential** | **1.73%** |

**b. The Prudential GIF's Poor Performance Continued through 2021**

133. As demonstrated in the table below, the Prudential GIF's poor performance continued through 2021.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2021 | Auto-Owners Insurance Company Retirement Savings Plan | 7,480 | $711,146,156 | Auto-Owners Insurance Company | 3.02% |
| | Ameritas 401(k) Retirement Plan | 3,537 | $779,870,323 | Ameritas Life Insurance | 3.43% |
| | The Standard 401(k) Plan | 4,674 | $1,062,535,266 | Standard Insurance | 3.29% |
| | Ford Foundation Retirement Plan | 198 | $309,155,677 | TIAA-CREF | 3.56% |
| | Transamerica 401(k) Retirement Savings Plan | 14,065 | $2,563,127,214 | Transamerica Financial Life | 3.32% |
| | **Sunrise 401(k) Plan** | **22,238** | **$330,555,409** | **Prudential** | **1.62%** |

134.    In 2021, the Prudential GIF underperformed the Comparator Funds by 51.26%.

135.    Additionally, the Prudential GIF underperformed other GICs with similar characteristics as the Prudential GIF in 2021, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2021 | Gemba Group Annuity Plan | 969 | $118,565,852 | National Ohio Financial Services | 4.97% |
| | Baylor College of Medicine Retirement Plan | 13,391 | $1,692,013,731 | Lincoln Financial Group | 4.23% |
| | Holzer Health System 401(a) Profit Sharing Plan | 2,017 | $203,815,263 | American United Life Insurance Company | 4.02% |
| | American United Life Progress Sharing Plan and Trust | 3,183 | $493,267,284 | American United Life Insurance Company | 3.87% |
| | Gemba Group Annuity Plan | 969 | $118,565,852 | Principal Life Insurance Company | 3.84% |
| | **Sunrise 401(k) Plan** | **22,238** | **$330,555,409** | **Prudential** | **1.62%** |

### c.    The Comparator Funds Outperformed the Prudential GIF in 2022

136.    As demonstrated in the table below, the Prudential GIF's poor performance continued through 2022.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2022 | Auto-Owners Insurance Company Retirement Savings Plan | 8,251 | $672,249,956 | Auto-Owners Insurance Company | 3.08% |

| | | | | | |
|---|---|---|---|---|---|
| | Ameritas 401(k) Retirement Plan | 3,779 | $636,210,578 | Ameritas Life Insurance | 3.30% |
| | The Standard 401(k) Plan | 4,832 | $931,024,946 | Standard Insurance | 3.22% |
| | Ford Foundation Retirement Plan | 174 | $261,575,612 | TIAA-CREF | 4.21% |
| | Transamerica 401(k) Retirement Savings Plan | 14,280 | $2,116,061,137 | Transamerica Financial Life | 3.23% |
| | **Sunrise 401(k) Plan** | **24,414** | **$289,572,523** | **Prudential/Empower** | **1.69%** |

137.   In 2022, the Prudential GIF underperformed the Comparator Funds by 50.41%.

138.   Additionally, the Prudential GIF underperformed other GICs with similar characteristics as the Prudential GIF in 2022, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2022 | International Imaging Materials Inc. Retirement and Investment Plan | 445 | $59,443,888 | Lincoln National Life Insurance Co. | 4.89% |
| | Baylor College of Medicine Retirement Plan | 14,036 | $1,434,738,254 | Lincoln Financial Group | 4.37% |
| | American United Life Progress Sharing Plan and Trust | 3,235 | $439,262,320 | American United Life Insurance Company | 3.90% |
| | Jackson National Life Insurance Company Defined Contribution Plan | 4,650 | $1,149,061,601 | Jackson National Life Insurance | 3.83% |

37

| | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|
| Allina 401(k) Retirement Savings Plan | 34,554 | $2,678,277,538 | Brighthouse Life Insurance Company | 3.69% |
| Trugreen Profit Sharing and Retirement Plan | 11,408 | $371,495,784 | Massachusetts Mutual Life Insurance Company | 3.67% |
| **Sunrise 401(k) Plan** | **24,414** | **$289,572,523** | **Prudential/Empower** | **1.69%** |

>    d.    **The Prudential GIF's Poor Performance Continued through 2023**

139.    As demonstrated in the table below, the Prudential GIF's poor performance continued through 2023.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2023 | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Insurance Company | 3.48% |
| | Ameritas 401(k) Retirement Plan | 3,686 | $741,588,807 | Ameritas Life Insurance | 3.66% |
| | The Standard 401(k) Plan | 5,371 | $1,129,069,194 | Standard Insurance | 3.64% |
| | Ford Foundation Retirement Plan | 126 | $287,214,199 | TIAA-CREF | 4.76% |
| | Transamerica 401(k) Retirement Savings Plan | 14,168 | $2,425,600,114 | Transamerica Financial Life | 3.79% |
| | **Sunrise 401(k) Plan** | **23,258** | **$333,311,609** | **Empower** | **1.84%** |

140.    In 2023, the Prudential GIF underperformed the Comparator Funds by 52.41%.

141.    Additionally, the Prudential GIF underperformed other GICs with similar characteristics as Prudential GIF in 2023, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2023 | Valley Hospital Retirement Defined Contribution Plan | 4,282 | $550,230,744 | Lincoln National Life Insurance Co. | 4.57% |
| | Mattel, Inc. Personal Investment Plan | 7,427 | $1,167,576,000 | Metropolitan Tower Life Insurance Co. | 3.71% |
| | Pomona Valley Hospital Medical Center Retirement Savings Plan | 4,219 | $525,201,271 | Lincoln National Life Insurance Co. | 3.64% |
| | Auto-Owners Insurance Company Retirement Savings Plan | 8,582 | $772,874,102 | Auto-Owners Life Insurance Company | 3.48% |
| | **Sunrise 401(k) Plan** | **23,258** | **$333,311,609** | **Empower** | **1.84%** |

        e.       **The Comparator Funds Outperformed the Prudential GIF in 2024**

142.    In 2024, the Comparator Funds outperformed the Prudential GIF.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2024 | Auto-Owners Insurance Company Retirement Savings Plan | 8,950 | $864,332,421 | Auto-Owners Insurance Company | 3.40% |
| | Ameritas 401(k) Retirement Plan | 3,632 | $821,792,248 | Ameritas Life Insurance | 3.91% |
| | The Standard 401(k) Plan | 5,845 | $1,332,816,995 | Standard Insurance | 4.01% |
| | Ford Foundation Retirement Plan | 90 | $298,370,091 | TIAA-CREF | 4.59% |

| | | | | | |
|---|---|---|---|---|---|
| | Transamerica 401(k) Retirement Savings Plan | 13,910 | $2,720,479,704 | Transamerica Financial Life | 3.86% |
| | **Sunrise 401(k) Plan** | **23,402** | **$360,105,590** | **Empower** | **2.01%** |

143.    In 2024, the Prudential GIF underperformed the Comparator Funds by 49.17%.

144.    Additionally, the Prudential GIF underperformed other GICs with similar characteristics as the Prudential GIF in 2024, as demonstrated in the table below.

| Year | Plan Name | No. of Participants | Plan Assets | Insurance Carrier | Crediting Rate |
|---|---|---|---|---|---|
| 2024 | Lexmark Savings Plan | 2,926 | $1,211,057,397 | American General Life Insurance Company | 3.38% |
| | Martignetti Companies, LLC 401(k) Plan | 1,160 | $240,540,763 | Massachusetts Mutual Life Ins. Co. | 4.35% |
| | Northeast Medical Services Profit Sharing 401(k) Plan | 1,467 | $174,979,442 | New York Life Ins. Co. | 4.58% |
| | Boyd Company 401(k) Plan | 1,762 | $204,430,246 | Standard Insurance Company | 3.21% |
| | **Sunrise 401(k) Plan** | **23,402** | **$360,105,590** | **Empower** | **2.01%** |

145.    Throughout the Class Period, the Prudential GIF underperformed the Comparator Funds by an average of over 50% as demonstrated in the table below.

40

| Year | Prudential GIF Rate of Return in the Plan | Comparator Fund Average Rate of Return | Prudential GIF Percentage of Underperformance in the Plan |
|---|---|---|---|
| 2020 | 1.73% | 3.42% | 49.39% |
| 2021 | 1.62% | 3.32% | 51.26% |
| 2022 | 1.69% | 3.41% | 50.41% |
| 2023 | 1.84% | 3.87% | 52.41% |
| 2024 | 2.01% | 3.95% | 49.17% |
| Average Underperformance during Class Period | | | 50.53% |

146.   The dramatic disparities between crediting rates in all years demonstrate that any purported difference in GIC type or theoretical risk cannot be the reason for the Prudential GIF's dismal crediting rate.

147.   Again, the specific Comparator Fund used herein had similar risk considerations based on its terms and the creditworthiness of its insurance carriers. The Comparator Funds were fully benefit-responsive and its crediting rates were regularly reviewed in the same prevailing marketplace and economic circumstances as the Prudential GIF.

148.   In short, because the Plan held about $300 million in assets under management at the start of the Class Period, it had considerable leverage to bargain for higher crediting rates.

149.   A prudent fiduciary would have known that other providers of fixed annuities offer substantially identical, better-performing stable value investments. A prudent fiduciary could have accomplished this goal by demanding higher crediting rates and/or by submitting requests for proposals to Prudential/Empower and other providers of stable value investments.

150.   There is one more noteworthy benchmark to consider. According to an article by the Stable Value Institute of America ("SVIA"), "[t]he Stable Value Investment Association recently examined 135,000 retirement savings plans serving approximately 42 million

participants. From January 2010 through December 2019, stable value assets in [retirement] plans grew at a compound annual rate of 4.1%."[20]

151.    Here, from 2020 to 2024 the Comparator Funds had an average return of 3.59%. Thus, the average returns for the Comparator GICs for this time period is a relatively conservative return compared to the 4.1% returns observed by the SVIA. Yet, even while conservative, the Comparator GIC's average returns were higher than the Prudential GIF's average returns.

152.    The Prudential GIF had an average return of 1.78% from 2020 to 2024.  This was over 56% less than the 4.1% returns the SVIA cited for 42 million participants.

153.    Thus, by selecting the Prudential GIF with underperforming crediting rates, Defendants failed to provide participants with an option that maximized the value of their investments.

154.    With the significant amount of assets under management in the Prudential GIF, the losses suffered by Plan participants were devastating costing the Plan and its participants millions of dollars.  Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). For example, a 1% higher fee over 35 years makes a 28% difference in retirement assets at the end of a participant's career.[21]

155.    In sum, the Prudential GIF in the Plan is a general account product that should have had a high crediting rate given its riskiness, yet it had underwhelming crediting rates when

---

[20] *See* "Retirement Plans and Stable Value: By  the Numbers," updated July 21, 2025, available at https://www.stablevalue.org/retirement-plans-and-stable-value-by-the-numbers/ (last visited March 9, 2026)

[21] Look at 401(k) Plan Fees, UNITED STATES DEPT. OF LABOR at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource center/publications/401k-plan-fees.pdf (accessed April 21, 2026).

compared against GICs with similar riskiness provided by other comparable carriers for other retirement plans.

156.    Given the Plan's substantial stable value investment assets, reasonably prudent monitoring of the Prudential GIF required Defendants to evaluate the terms and conditions of the GIC contract, research the relevant market, and test the market by, among other things, issuing requests for information and proposals from competing stable value providers.  All of which they failed to do.

## VII.    ERISA'S PROHIBITED TRANSACTIONS PROVISIONS

157.    Restrictions under ERISA prohibit fiduciaries from causing the Plan to engage in transactions with themselves or other fiduciaries or parties-in-interest. *See* 29 U.S.C. § 1106(a)-(b). Section 1106(a)(1) states, in pertinent part:

> A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> (A)    sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> . . .
>
> (C)    furnishing of goods, services, or facilities between the plan and a party in interest;
>
> (D)    transfer to, or use by or for the benefit of a party in interest, of any assets of the plan . . . .

158.    Section 1106(b) further provides, in pertinent part:

> A fiduciary with respect to the plan shall not –
>
> (1)    deal with the assets of the plan in his own interest or for his own account,
>
> (2)    in his individual or in any other capacity act in a transaction involving the plan on behalf of a party (or represent a party)

43

whose interests are adverse to the interest of the plan or the interests of its participants or beneficiaries, or

(3)     receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

## A.     Defendants Committed a Prohibited Transaction Resulting in Excess Compensation Paid to Prudential/Empower

159.    During the Class Period, Defendants allowed Plan assets to be invested in the Prudential GIF that performed poorly when compared to other investments that were available.

160.    Prudential/Empower was a party in interest[22] to the Plan as was receiving compensation for managing/maintaining the Prudential GIF, as well as indirect compensation from the spread – the difference between the amount Prudential/Empower earned on the investments and the amount Prudential/Empower paid to Plan participants.

161.    As an alternative to investing Plan assets in the Prudential GIF, the Plan could have invested assets in better performing investments with the same investment strategies and goals. Defendants failed to consider this approach because it would have eliminated the compensation earned by Prudential/Empower.

162.    Defendants did not prudently and objectively evaluate the Prudential GIF in the interests of Plan participants, as prudent fiduciaries would do. Rather, Defendants selected the Prudential GIF in order to benefit Prudential/Empower and its/their affiliates.

---

[22] "Certain of the Plan's investments are managed by affiliates of the trustees [Prudential prior to April 1, 2022 and Empower on April 1, 2022 and continuing thereafter], and therefore, these transactions qualify as party-in-interest transactions. Fees incurred by the Plan for the investment manager services are included in net depreciation in the fair value of investments, as they are paid through revenue sharing, rather than a direct payment." Auditors' Report, attached to 2022 Form 5500 for the Plan, at 13; *see also id*., at 7 ("Effective April 1, 2022, Empower acquired the full-service retirement business of Prudential.").

163. The Plan's sizeable investment in the Prudential GIF provided Prudential/Empower a substantial amount of compensation at the expense of Plan participants.

## COUNT I
### Breaches of Fiduciary Duty of Prudence
### (against the Committee)

164. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

165. At all relevant times, the Committee and its members ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that it exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

166. As fiduciaries of the Plan, the Prudence Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

167. The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. Prudence Defendants did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan's participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite poor performance in relation to other comparable investments.

168. As a direct and proximate result of the breaches of fiduciary duties alleged herein related to the Prudential GIF, the Plan suffered millions of dollars of losses due to excessive costs

45

and lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

169.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

170.    The Prudence Defendants knowingly participated in each breach, knowing that such acts were a breach, and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.

**COUNT II**
**Failure to Adequately Monitor Other Fiduciaries**
**(against the Company)**

171.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

172.    Sunrise (the "Monitoring Defendant") had the authority to appoint and remove members of the Committee, and the duty to monitor the Committee and was aware that the Committee had critical responsibilities as fiduciaries of the Plan.

173.    In light of this authority, the Monitoring Defendant had a duty to monitor the Committee to ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

174.    The Monitoring Defendant also had a duty to ensure that the members of the Committee possessed the needed qualifications and experience to carry out their duties; had

adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to the Company.

175. The Monitoring Defendant breached its fiduciary monitoring duties by, among other things, failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions.

176. As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars in losses. Had the Monitoring Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

177. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendant is liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

**COUNT III**
**PROHIBITED TRANSACTION**
**(against all Defendants)**

178. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

179. Under ERISA, a plan fiduciary may not "cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect" (i) exchange of any property between the plan and a party in interest, or (ii) the furnishing of services between the plan and a party in interest. 29 U.S.C. § 1106(a)(1)(C).

180.    Defendants were at all times fiduciaries to the Plan.

181.    ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan," and "(H) any employee, officer, or director of such employer."

182.    Defendants caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transactions constituted a direct or indirect exchange of property between the Plan and Prudential/Empower.

183.    Defendants also caused the Plan to engage in the annuity transactions with actual or constructive knowledge that the transaction constituted a direct or indirect furnishing of services between Prudential/Empower and the Plan.

184.    When Defendants caused the Plan to engage in the annuity transaction, Prudential/Empower was a party in interest, including because Prudential/Empower, or its affiliate, was a person providing recordkeeping and trustee services to the Plan. 29 U.S.C. § 1002(14). Defendants knew of that fact when they caused the Plan to engage in the annuity transaction.

185.    These transactions occurred each time the Plan paid fees to Prudential/Empower in connection with the Plan's investments in the Prudential GIF and other proprietary options that paid revenue sharing to Prudential/Empower.

186.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(C) and (D).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.      A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.      An order requiring the Company Defendant to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

49

F.      Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.      An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Dated: April 23, 2026                    Respectfully submitted,

                                         */s/ Mark K. Gyandoh*
                                         Mark K. Gyandoh, Esquire
                                         James A. Maro, Esquire
                                         **CAPOZZI ADLER, P.C.**
                                         312 Old Lancaster Road
                                         Merion Station, PA 19066
                                         Email: markg@capozziadler.com
                                                jamesm@capozziadler.com
                                         Tel.: (610) 890-0200

                                         *Counsel for Plaintiffs and the Putative Class*

50

**CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2026, a true and correct copy of the foregoing document was filed with the Court utilizing its ECF system, which will send notice of such filing to all counsel of record.

By:  */s/Mark K. Gyandoh*
Mark K. Gyandoh, Esq.